UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | CAUSE NO. 3:11-CR-96 JD |
| | ) | |
| MICHAEL ALTER | ) | |

## ORDER

Michael Alter is charged by superseding indictment with three child pornography offenses: Count 1, knowingly receiving a visual depiction of a minor engaging in sexual conduct, in violation of 18 U.S.C. § 2252(a)(2), in July 2011; Count 2s, knowingly possessing or accessing with intent to view one or more visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(4)(B), on or about August 23, 2011; and Count 3s, charging that the same occurred on or about August 16, 2006. On March 28, 2012, Alter filed a motion to suppress. [DE 48]. In it, he asks the court to suppress the evidence underlying each count of the indictment. On April 18, 2012, the government responded, and on May 14, 2012, Alter replied. On July 19, 2012, the Court held an evidentiary hearing on the motion, and, after accepting some additional submissions thereafter, took the motion under advisement. For the reasons stated herein, the motion to suppress is **DENIED**.

## BACKGROUND

The evidence Alter hopes to suppress comes from two different searches, separated by five years. The first search, on August 16, 2006, was largely the product of the investigative efforts of Jessica and David Pasley, Alter's adult step-children. On July 14, 2006, Jessica Pasley (age 27 at the time) approached Indiana State Police Detective David Rich regarding a check which the defendant allegedly cashed without permission. During that conversation, Jessica also informed

1

Detective Rich that she and her brother had seen a photograph of a naked twelve-year-old girl on Alter's computer the previous November. During the evidentiary hearing, Jessica testified that the computer was located in the "TV room", that she and David had occasionally used the computer, and that it was not password protected. Jessica was concerned by the photograph because she was aware of Alter's prior convictions and because she had previously seen him behave unusually around her young female cousin. Detective Rich conveyed the information to the Fulton County Prosecutor's Office, which indicated that Rich did not have enough evidence to obtain a search warrant at that time. When Detective Rich conveyed the message to Jessica, she told him she would go back and get more current information from Alter's computer. Detective Rich discouraged that, advising Jessica that he could not send her to get more information. He specifically told Jessica not to try to obtain any more evidence, because if she did it could be interpreted as her acting as a government agent and might jeopardize the investigation.

On two separate occasions, July 17, 2006, and shortly thereafter, Jessica Pasley delivered a digital camera and memory card that she owned, which Alter had borrowed for an extended period of time, to the police. Police were unable to recover any images from the camera or the card; it appeared that Alter had deleted files before returning the items to Jessica. Detective Rich did not ask for or demand that Jessica provide these items. She brought them in of her own volition.

On August 8, 2006 Detective Rich met with Jessica Pasley again. This time, she was accompanied by her brother, David Pasley, who was home on leave from military service. Detective Rich interviewed David alone,[1] while Jessica stayed at the front of the station. David provided

---

[1] While David Pasley did not testify at the evidentiary hearing, the government submitted a taped, sworn 2010 interview between David and Detective Don Curl without objection from the defense. In the recording, David recounts his 2006 interview with Detective Rich. The recording is discussed in more detail later in this opinion. The government also submitted Detective Rich's investigative report summarizing the interview with no objection.

2

Detective Rich with some additional detail about the photographs he had seen, which included not only the photograph he shared with his sister, but one of an approximately eight-year-old girl lying on her back on a bed and exposing her vagina. He also recounted a disturbing incident at a family gathering the Christmas prior, in which Alter and David's eight-year-old niece disappeared into a playroom together, followed shortly by the girl running out of the room screaming. After interviewing David, Detective Rich asked if either of the Pasleys knew Alter's email address or the name of his internet service provider. According to Detective Rich's report, Jessica stated that she would be able to obtain that information and would contact him with it in the future, but Jessica claims she does not remember that interaction. She insists Detective Rich stressed the importance of her staying out of the investigation, telling her she could not try to get more information. Jessica testified that David indicated to her that Rich had given the same direction to him, and the recorded interview confirms as much.

After leaving the police station on August 8, 2006, David was upset that he was unable to be more helpful. He wanted to go to Alter's house to look up more information on the computer. Jessica testified that she counseled David against this, and that it would look like they were trying to obtain more information and aid in the investigation. Detective Rich had specifically warned David not to take any independent investigative actions, but David disregarded those warnings. Jessica drove David to the home Alter shared with their mother, but she stayed in the car while he went inside. David logged on to the computer, which was not password protected and was located in an open and accessible part of the living room. He was unable to obtain Alter's internet service provider, but he did find numerous photographs of young girls, naked, in poses exposing their genitals. Based on this new information, police obtained a search warrant, executed it on August 16,

3

2006, and seized Alter's computer.

When the search warrant was executed, the officers recovered a computer containing a Seagate 80GB hard drive, serial number 3HV1K294. Alter and his wife were both interviewed that day. His wife said that the computer belonged to Alter, but that she used it occasionally to play games, and that her daughter used it to check her email. Alter said that when turned on the computer went directly into a desktop (in other words, was not password protected) and that he used it about a third of the time, his wife about a third of the time, and the children the rest of the time. Indiana State Police Detective Jeremy Chapman examined Alter's computer. He found in excess of 5000 images that constituted child pornography. He also found folders in the outlook express program related to news groups in which the suspect participated. Several of them had titles that indicated an interest in child pornography, such as "alt.binaries.pictures.lolita.dbx."

On February 1, 2007, the Fulton County Prosecutor filed a state law charge against Alter for possession of child pornography. On September 24, 2007 the defendant filed a motion to suppress arguing that David Pasley was acting as a government agent when he entered the home and accessed the computer, and that his warrantless search was therefore a misstep of constitutional dimension. At the suppression hearing on December 12, 2007, neither Detective Rich (who had by that time been killed in the line of duty) nor David Pasley (who could not be located) testified. On February 22, 2008, the court issued an order suppressing the search based on the following conclusion:

> "[T]his Court believes that in Indiana, with its higher burden of proof in a suppression case the State must show beyond a reasonable doubt that David Pasley was not the agent or instrumentality of State Trooper David Rich in obtaining the information for the search warrant.
>
> "The Court's ultimate determination in this case is that the State has in fact shown that to the Court's satisfaction by preponderance of the evidence (if this were federal court, the State would win), but with no witnesses available to present evidence upon

> this topic, only documentary evidence and a clear record of David Rich's knowledge what the legal issue could be, this Court cannot find beyond a reasonable doubt that Pasley had not become the instrument or agent of Rich. Under these circumstances and Indiana law, the Court finds that Motion to Suppress to be proper and the Court excludes the evidence seized through the warrant from presentation."

Subsequent to the judge's ruling, the state court case was dismissed.

David Pasley was eventually located living in San Francisco, California. On September 2, 2010, Indiana State Police Detective Don Curl recorded a telephone interview with David. In that conversation, Pasley confirmed that Detective Rich asked, back in 2006, if either of the Pasleys knew the suspect's email address or the internet provider. When asked if Detective Rich had requested either David or Jessica to return to their mother's house to obtain that information, Pasley also confirmed that Detective Rich specifically told them that he could not direct them to do anything because it would be a violation of law. David said that after speaking with Rich, he made the decision to go back to his mother's house and attempt to obtain the information Rich had discussed. David said the children had general access to the house, that the door was never locked, and that his mother was upstairs sleeping when they arrived. David confirmed that he had not located the email address nor the identity of the internet service provider, but looked at the computer again and saw the same images that he had seen in November 2005. He said that he had turned the computer on, and that he had always had free access to it. At the end of the recording, David affirmed under penalty of perjury that this information was correct.

Alter was indicted by a federal grand jury on August 10, 2011, and arrested at work at about 9:00 am on August 23, 2011. Two investigators, Detective Curl and United States Secret Service Agent Thomas Messner, went to his home and spoke with his then-wife, Rosa Romero-Sanchez. The officers were dressed in plain clothes, and were not brandishing weapons. Two ISP forensic

examiners were available as well, waiting in vehicles to examine any computers that might be present in the home if Romero-Sanchez granted consent. Curl and Messner informed Romero-Sanchez that her husband was being arrested on a warrant for charges of possession of child pornography. Based on their initial conversations, they determined that Romero-Sanchez could not speak English very well and arranged for a Logansport police officer to come to the home and translate.

Once the translator, Sergeant Carlos Leal, arrived, Detective Curl interviewed Romero-Sanchez to determine if she was aware of any current activity involving child pornography and whether there were any children in the home. Romero-Sanchez stated that she was not aware of any child pornography in the home. Officers asked Romero-Sanchez if there were any computers in the home and she showed them two computers, a laptop and a Dell desktop. The desktop computer was located in a common area of the house, and it was accessible to Romero-Sanchez. The officers asked her whether she had access to the computers and whether she used them. She stated that she had used the computers once or twice and had never been prohibited access. The officers then asked whether they could look at the computers to determine if they contained any illegal child pornography. Sergeant Leal read a Spanish language consent form to Romero-Sanchez, who signed the form and consented to a computer search. She also gave an oral consent.

After Romero-Sanchez consented to the search, she was interviewed at her dining room table by Curl and Leal. During the interview the officers inquired into whether the defendant had access to any children, and Romero-Sanchez identified a six year old girl, her son's girlfriend's child, who had lived with the couple for one week periods around Christmas 2010 and Easter 2011. Romero-Sanchez provided a photograph of the child which the examiners used to determine if the

6

defendant had taken any inappropriate photographs of the child.

Both computers were examined by ISP forensic examiners at the scene. The examiners did not find any child pornography on the laptop. But Indiana State Police Sergeant Jeremy Chapman found approximately 40 images of suspected child pornography on the Dell desktop computer in an initial triage examination. Officers also found a Dell Olympus 2GB picture card taped to the back of the monitor. This type of card can be used to store digital images and videos and it appeared to be in that location in order to remain concealed.

Sergeant Chapman viewed the images on the desktop computer through software which accessed the computer's contents directly. The "N-case" software would have bypassed any passwords that were in place on the machine, and, as a result, the government cannot confirm whether the computer or any particular files were password protected, although the search did appear to confirm that no encryptions had been established. In any case, the parties agree that Alter and Romero-Sanchez were husband and wife; that the officers reasonably believed Romero-Sanchez was Alter's wife; that the computer was physically located in an open and readily accessible area where Romero-Sanchez had access to it; that Romero-Sanchez told officers she occasionally used the computer; and that Romero-Sanchez told the officer she had never been prohibited from using the computer. Romero-Sanchez did not tell the officers whether the computers were password protected; she simply represented that she had access to them.

On August 24, 2011, the Magistrate Judge issued a search warrant for the computers that were found in the home, along with the memory card. As a result of the full forensic examination, Sergeant Chapman found approximately 1,878 images of suspected child pornography. These charges followed, as did Alter's motion to suppress. Alter objects to the first search – in 2006 – on

the same grounds that were dispositive in the state court case: he argues that the Pasleys were government agents and that their actions should therefore be attributed to Trooper Rich. Alter initially objected to the second search – in 2011 – for two reasons. First, he argued that it exceeded his wife's authority to consent. Second, he argued that the consent was not truly voluntary because of his wife's immigration status and her language barrier. At the hearing, Alter withdrew his second objection to the second search, leaving only Romero-Sanchez's authority to consent at issue.

## DISCUSSION

### I. The 2006 Search – Agency Issue

"The Fourth Amendment generally does not apply to searches and seizures by private parties, but it does apply if the private party is acting as a government agent." United States v. Aldridge, 642 F.3d 537, 541 (7th Cir. 2011) (citing United States v. Hall, 142 F.3d 988, 993 (7th Cir.1998)). "The defendant bears the burden of proving agency, based on all the circumstances." Id. (citing United States v. Shahid, 117 F.3d 322, 325 (7th Cir.1997)). "In Shahid, [the Seventh Circuit] identified two lines of inquiry that assist in this analysis: 'whether the government knew of and acquiesced in the intrusive conduct and whether the private party's purpose in conducting the search was to assist law enforcement agents or to further [his or her] own ends.'" Id.

The Court's primary focus is on the *Shahid* factors, but it is worth noting that other, more general, considerations also come into play. For example, in *Aldridge*, the Seventh Circuit also mentioned traditional, common law agency principles:

> "Looking at the matter more generally, we see that the Restatement (Third) of Agency defines agency as 'the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.' Restatement (Third) of Agency § 1.01 (2006). Both sides must agree, in other words, to the creation of the agency relationship."

8

*Aldridge*, 642 F.3d at 541. And, in *Shahid* itself, the Seventh Circuit also considered the questions whether the private actor acted at the request of the government and whether the government offered the private actor a reward. 117 F.3d at 325.

The state court suppressed the fruits of the 2006 search because under Indiana law, the government bears the burden of proving "beyond a reasonable doubt" that its evidence was lawfully obtained. Under federal law, the standard of proof on a motion to suppress is a preponderance of the evidence. *See United States v. Gillespie*, 974 F.2d 796, 800 (7th Cir. 1992) ("As a general matter, '[t]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.'") (citing *United States v. Matlock*, 415 U.S. 164, 178 n. 14 (1974)). And that burden falls on different parties depending on the nature of the issue. As previously mentioned, the burden of proving agency is on the defendant. *Shahid*, 117 F.3d at 325. Thus, the fact that the government failed to meet its burden in state court has little effect on the outcome here.

The defendant failed to discharge his burden of proving an agency relationship by a preponderance of the evidence. He has highlighted the interactions between the Pasleys and Detective Rich, but has failed to show that "the government knew of and acquiesced in the intrusive conduct" or that "the private party's purpose in conducting the search was to assist law enforcement[,]" as opposed to furthering his or her own ends. *Shahid*, 117 F.3d at 325. Not one instance has been shown where Detective Rich knew of an investigative action by Jessica or David *before* that individual conducted it, let alone knew of that action *and* encouraged or condoned it. To the contrary, the uncontradicted evidence shows that Detective Rich went out of his way to discourage the Pasleys from participating in the investigation. Certainly, an officer's use of "magic

9

words" to disavow an agency relationship does not conclusively prove that an agency relationship did not exist. *See United States v. O'Dell*, 73 F.3d 364 (7th Cir. 1995) (table). But the undisputed evidence that Detective Rich actively discouraged the Pasleys' participation does weigh in the analysis, as it tends to show a lack of cooperation. With respect to the Pasleys' purpose in assisting law enforcement, the evidence solicited at the evidentiary hearing made it more clear, if anything, that the Pasleys' efforts in exposing Alter's possession of child pornography were motivated by concern for a young relative and perhaps, to some extent, by Jessica's animosity over a check dispute. These are not adopted government purposes; these are personal, and do not establish an agency relationship. The fact that both Pasleys did eventually want Alter charged and/or arrested is not dispositive; it is their motivation for acting, not the end result they desire, that counts. *See, e.g., Shahid*, 117 F.3d at 326 (holding that although a mall security guard who seized the defendant did eventually intend to turn that defendant over to law enforcement, his primary purpose was "to provide safety and security for all persons on mall property[;]" as a result, he was not acting as a government agent).

Moreover, the *Shahid* factors only inquire into the government's knowledge and consent, as well as the informant's purpose, *with respect to the intrusive conduct*. 117 F.3d at 325. The only conduct by either Pasley which could be considered constitutionally intrusive was David's search of the computer. Detective Rich's interactions with Jessica are therefore besides the point; they never led to any actions by Jessica which, if she were considered a government agent, would violate Alter's Fourth Amendment rights. The question is therefore whether Detective Rich built an agency relationship with David that would render David a government actor when he searched the computer. Far from proving as much by a preponderance of the evidence, the defendant has

10

introduced no evidence whatsoever of any such relationship between David and Detective Rich. In fact, the two had just met that morning. Detective Rich never asked for a computer search. He actively discouraged further investigation, and he offered no incentive or reward. In similar and even more egregious cases, the Seventh Circuit has found no agency relationship. *See, e.g., Aldridge*, 642 F.3d at 542 (finding no agency relationship when citizen initiated cooperation, government's involvement only began after receiving materials from her, and government agents merely suggested that citizen keep her eyes peeled and send in any suspicious materials she might find); *United States v. Ginglen*, 467 F.3d 1071 (7th Cir. 2006) (finding that defendant's sons did not act as police agents when they searched their father's home without notifying police in advance, without obtaining a reward, and without collecting any evidence inside, even though one of the brothers was an off-duty police officer who wore his badge, gun, and bulletproof vest during the search); *United States v. Feffer*, 831 F.2d 734 (7th Cir. 1987) (no agency relationship where IRS agents did not encourage informant to take documents, despite the fact that agents explained their policy was to accept any documents brought in, and fully expected to see the informant again).

Finally, while Detective Rich did ask the Pasleys if they knew Alter's email address and internet service provider, that information was easily obtainable without any violation of the defendant's constitutional rights. It was not out of the question, for example, that Alter would have emailed David at some point, or that David was aware of which company provided internet service at his mother's house. It is a bridge too far to suggest that, by requesting information which was easily obtainable without a constitutional violation, and by discouraging David from taking any further steps to obtain that information, Detective Rich somehow rendered David a government agent during a subsequent and unanticipated search of the defendant's computer for photographic

evidence. Once David did voluntarily report the findings of his search, there was nothing independently wrong with Detective Rich using those findings to procure a warrant. *See Rann v. Atchison*, __ F.3d __, 2012 WL 3140137 (7th Cir. 2012) ("When a private party provides police with evidence obtained in the course of a private search, the police need not 'stop [him] or avert their eyes.'"). The Court sees no agency relationship here, and Alter's motion to suppress, with respect to the 2006 search, is denied.

## II.     The 2011 Search – Authority to Consent Issue

"[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). Furthermore, "the exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant[.]" *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990)). Several circuits have addressed the issue of a third party's authority to consent to a search of a shared computer. In general, these courts have decided that when one user has protected files with a password that the other user does not know, the second user cannot consent to a search of the password-protected files. *See United States v. Buckner*, 473 F.3d 551, 554 (4th Cir.), cert. denied, 550 U.S. 913 (2007); *Trulock v. Freeh*, 275 F.3d 391, 403 (4th Cir. 2001). On the other hand, when the joint users share access to the computer's files, either one can consent to a search of the whole computer. *See United States v. Morgan*, 435 F.3d 660, 663-64 (6th Cir. 2006); *United States v. Andrus*, 483 F.3d 711, 719-22 (10th Cir. 2007).

The Seventh Circuit has not squarely confronted the issue in a published case, but did acknowledge the above distinction, drawn by other circuits, with approval in *Antonelli v. Sherrow*, 246 Fed. Appx. 381, 384 (7th Cir. 2007). The factors considered by the Eighth Circuit are helpful, as well: "When determining whether a third party exercised actual or apparent common authority over the contents of a computer, courts typically examine several factors: whether the consenting third party in fact used the computer; whether it was located in a common area accessible to other occupants of the premises; and – often most importantly – whether the defendant's files were password protected." *United States v. Clutter*, 674 F.3d 980, 984 (8th Cir. 2012) (citing *United States v. Stanley*, 653 F.3d 946, 950–51 (9th Cir. 2011); *United States v. Stabile*, 633 F.3d 219, 232–33 (3d Cir.), cert. denied, ___ U.S. ___ , 132 S.Ct. 399 (2011); *Andrus*, 483 F.3d at 719–20; *Buckner*, 473 at 554–55; *United States v. Morgan*, 435 F.3d 660, 663–64 (6th Cir. 2006)). The government bears the burden of proving by a preponderance of the evidence that it obtained valid consent to a search. *See United States v. Willis*, 61 F.3d 526, 531 (7th Cir.1995), cert. denied, 518 U.S. 1007 (1996); *United States v. Saadeh*, 61 F.3d 510, 517 (7th Cir.), cert. denied, 516 U.S. 990 (1995); *Buckner*, 473 F.3d at 554.

In this case, it is undisputed that Romero-Sanchez had access to the computer. It is undisputed that she used it occasionally, and that it was located in an open and accessible common area of the house. The only question mark concerns whether any part of the computer was password protected. Neither side was able to conclusively answer that question. What does seem to be clear is that there is no evidence to suggest that police knew, or should have known, that the computer was password protected. Given the paramount importance the courts tend to give to the question of password protection, that lack of evidence does preclude the court from finding *actual* authority to

consent. It may have been present, or it may not, but without any knowledge of whether the computer or its files were password protected, this Court cannot decide the issue. That has no bearing, however, on whether Romero-Sanchez had *apparent* common authority over the contents of the computer. It is clear that she did, and that the officers reasonably believed she had authority to consent. Romero-Sanchez represented herself to be the defendant's wife, and explained that she had access to the computer and used it on occasion. She did not mention any passwords, and it was not unreasonable for the officers to assume that if Romero-Sanchez had access to and used the computer, its contents were not closed off to her by a password. For that reason, the consent was valid, and Alter's motion to suppress the fruits of the 2011 search must be denied.

## **CONCLUSION**

For the reasons stated herein, Alter's motion to suppress [DE 48] is **DENIED**. The Court will contact counsel to set a trial date within the time remaining on the speedy trial clock.

SO ORDERED.

ENTERED:  September 7, 2012

/s/ JON E. DEGUILIO
Judge
United States District Court